UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                  :

CLAUDIA RIVAS, as parent and natural guardian of  :
S.C., and CLAUDIA RIVAS, individually,           :
                                  :

                Plaintiffs,        :        22-cv-10007 (LJL)
                                  :

          -v-                    :        OPINION AND ORDER
                                  :

DAVID C. BANKS, in his official capacity as Chancellor :
of the New York City Department of Education, and  :
NEW YORK CITY DEPARTMENT OF EDUCATION,  :
                                  :

              Defendants.     :
                                  :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/27/2023

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Claudia Rivas (the "Parent"), on behalf of both herself and her son, S.C., and

defendants the New York City Department of Education and David Banks, in his official

capacity as Chancellor of the New York City Department of Education (together, the "DOE")

cross-move for summary judgment, pursuant to Federal Rule of Civil Procedure 56. Dkt. Nos.

15, 20. For the reasons that follow, the Court denies the Parent's motion, grants the DOE's

motion in part, and remands for clarification of the DOE's financial obligations under the August

24, 2021 pendency order.

<b>BACKGROUND</b>

      During the 2021–2022 school year, S.C. was an eleven-year-old boy who had been

diagnosed with several severe disabilities, including cystic encephalomalacia, global central

nervous system injury, seizure disorder, hypoxic-ischemic encephalopathy, cerebral palsy, optic

atrophy, and cortical visual impairment. Administrative Record ("A.R.") 9.[1] He was both

---

[1] The Parent filed a letter on April 17, 2023, Dkt. No. 14, attaching the certified Administrative

nonverbal and non-ambulatory and received all hydration and nutrition through a percutaneous endoscopic gastronomy tube. *Id.* As a result, S.C. was fully dependent on others for all activities of daily living. *Id.* However, S.C. communicated using facial expressions, head turning, touching desired objects, and pressing switches with minimal support. *Id.*

Since the 2018–2019 school year, S.C. has attended the International Institute for the Brain ("iBrain"), a private school in New York City. *Id.* at 8 & n.2. On January 22, 2021, in anticipation of the annual revision of S.C.'s DOE-imposed Individual Education Program ("IEP"), iBrain developed its own education plan for S.C.'s 2021–2022 school year. *Id.* at 9. The iBrain plan recommended that S.C. enroll in a twelve-month program at a private school, receive instruction in a classroom with a ratio of six students to one teacher and one paraprofessional (a "6:1:1 class"), and have dedicated 1:1 care from a paraprofessional. *Id.* iBrain's plan also proposed that S.C. receive the following "related services" each week: five hour-long occupational therapy sessions, five hour-long physical therapy sessions, five hour-long speech-language therapy sessions, three hour-long vision education sessions, one hour-long parent counseling session, and one hour-long assistive technology session. *Id.* Additionally, the iBrain plan observed that S.C. had benefitted from weekly music therapy sessions and therefore recommended two hour-long music therapy sessions per week. *Id.*

On February 1, 2021, a DOE Committee on Special Education ("CSE") convened for the annual review of S.C.'s IEP. *Id.* at 10. The CSE's 2021–2022 IEP stated that S.C. should receive special education as a student with a traumatic brain jury. *Id.* Like the iBrain plan, the IEP provided that S.C. should enroll in a twelve-month special education program, attend 6:1:1 classes, and receive 1:1 care from a paraprofessional. *Id.* The IEP did not require music therapy,

---

Record, Dkt. Nos. 14-1–14-12.

but otherwise included the same weekly related services as the iBrain plan.  *Id.*  Finally, the IEP recognized that S.C. needed special transportation measures, including a lift bus with air conditioning.  *Id.*

The DOE sent the Parent letters on February 19, 2021 that described the terms of the IEP, *id.* at 607–09, and stated that the IEP services "will be provided at" P.S. 168, a public school within District 75—a school district designated for special education instruction—located at 3050 Webster Avenue in the Bronx, *id.* at 611.  However, on June 16, 2021, the DOE sent the Parent a follow-up letter, explaining that S.C. had been reassigned to P.S. 168's location within the P.S. 551 building at 339 Morris Avenue in the Bronx.  *Id.* at 617.

On June 23, 2021, the Parent responded to the DOE with a letter explaining that she rejected both the IEP and school placement and intended to unilaterally place S.C. in iBrain for the 2021–2022 school year.  *Id.* at 10.  But her letter indicated that she remained open to enrolling S.C. in an appropriate DOE school.  *Id.*  Two days later, she signed an enrollment agreement with iBrain.  *Id.*

The Parent filed a Due Process Complaint ("DPC") with the DOE on July 6, 2021, contending that the IEP and school placement failed to provide S.C. with a Free Appropriate Public Education ("FAPE"), in violation of both federal and New York law.  *Id.* at 10–11, 404–10.  Specifically, the DPC challenged the IEP's failure to require music therapy and an extended school day.  *Id.* at 407.  The DPC also averred that the assigned school could not implement the IEP because it did not offer extended school days and, as a District 75 school, had 6:1:1 classes that were "primarily for students on the autism spectrum," who would not be an appropriate peer group for S.C.  *Id.*  As the DPC asserted that iBrain was an appropriate placement and the

equities favored the Parent, the DPC requested declaratory relief and an order directing the DOE to pay S.C.'s iBrain tuition for the 2021–2022 school year. *Id.* at 408–09.

An Impartial Hearing Officer ("IHO") held an initial hearing on August 24, 2021 to determine S.C.'s "stay-put" placement during the proceedings. *Id.* at 12, 112.  Following the hearing, the IHO issued a pendency order that required the DOE to fund S.C.'s attendance of iBrain and pay "the cost of related services during the 2021–2022 extended school year which includes relates services, and 1:1 paraprofessional." *Id.* at 114.  She further ordered the DOE to cover the costs of S.C.'s special transportation up to a maximum cost of $355 per trip.  *Id.*  By its terms, the pendency order was to expire when "a final resolution of the matter is reached."  *Id.*

S.C. was hospitalized between August 2021 and January 2022.  *Id.* at 11.  He was not medically cleared to receive in-person or remote instruction during that time, so he did not attend school.  *Id.*  But on January 14, 2022, S.C. secured the necessary medical approvals and resumed services from home.  *Id.* at 12.

An impartial hearing ensued over the course of five nonconsecutive days between October 6, 2021 and April 18, 2022.  *Id.* at 6, 30.  On May 5, 2022, the IHO issued her findings of fact and decision.  *Id.* at 6, 43.  She determined that the DOE offered S.C. a FAPE for the 2021–2022 school year.  *Id.* at 40.  While the IHO acknowledged that iBrain's director of special education testified that music therapy was beneficial to S.C., *id.* at 37 (citing *id.* at 236–37), the IHO credited the CSE's finding that the goals served by music therapy could be met through other "occupational, physical and speech and language services as well as with assistive technology," *id.* at 38.  Accordingly, the IHO ruled that the "DOE is not obligated to provide music therapy."  *Id.*  Next, she rejected the Parent's contention that S.C.'s IEP necessitated an extended school day.  *Id.* ("Although not addressed at the hearing, . . . I find that DOE is not

required to provide an extended school day.").  The IHO likewise found the Parent's concern that

S.C. would be inappropriately placed with autistic children "purely speculative."  *Id.*  And

because the Parent did not challenge the wheelchair accessibility of S.C.'s school until her

"closing" argument, the IHO declined to reach that issue.  *Id.*

      Although the conclusion that the DOE provided S.C. a FAPE was dispositive, the IHO

nevertheless examined the remaining two steps in the reimbursement analysis "[i]n order to have

a complete record."  *Id.* at 40.  She determined that iBrain was an appropriate placement for S.C.

based on his prior progress at the school.  *Id.* at 41.  Finally, the IHO found that the equities

favored the Parent since "there is no evidence that Parent did anything but cooperate."  *Id.* at 42.

However, because the DOE offered S.C. a FAPE, she denied the Parent's "requests for funding

for [S.C.'s] attendance at iBrain during the 2021–2022 school year."  *Id.* at 43.

      On June 14, 2022, the Parent appealed the IHO's findings of fact and decision to a State

Review Officer ("SRO").  *Id.* at 53.  The Parent reprised her argument that an IEP without music

therapy would be inappropriate for S.C.  *Id.* at 60.  She contended that the IHO erred in deciding

that an extended school day was unnecessary because the DOE failed "to rebut Parent's

allegation that it was impossible to implement the February 1 IEP without an extended school

day."  *Id.* at 59.  According to the Parent, in characterizing her grouping concerns as speculative,

the IHO ignored "extensive testimony" that S.C. would be placed in a class with autistic students

at his assigned DOE school, thereby jeopardizing his educational goals and safety alike.  *Id.* at

61.  Though the Parent conceded "the school's inaccessibility was not raised in the DPC," she

asserted that "the fact that S.C. could not even get to his classroom renders the school location

inappropriate on its face."  *Id.*  The DOE opposed her appeal.  *Id.* at 66–73.

The SRO issued a decision on July 25, 2022 that affirmed the IHO's decision and dismissed the Parent's appeal. *Id.* at 28.  Like the IHO, the SRO determined that the IEP offered a FAPE even though it did not require music therapy, as the IEP included goals and services to develop the same motor, social, and communication skills "underlying iBrain's recommendation for music therapy." *Id.* at 21.  Nor was the IEP deficient in failing to mandate an extended school day. *Id.* at 23.  The SRO reasoned that the assigned DOE school could provide the related services described in the IEP during an ordinary school day because specialists could assist S.C. while he received classroom instruction. *Id.*  Indeed, the SRO noted, iBrain provided approximately 50% of its related services to students during classes. *Id.*  The SRO stated that the Parent's related challenge to the assigned DOE school—on the grounds that it did not offer extended school days and therefore could not implement an appropriate IEP—failed for the same reason and was unduly speculative. *Id.* at 23–24.  Additionally, the SRO agreed with the IHO that "all questions presented by the parent which related to other students in the classroom at the public school were speculative." *Id.* at 26.  The SRO also remarked that the iBrain director's testimony regarding the prevalence of autistic students was based on her observations of a different District 75 school during the 2010–2011 school year. *Id.* at 27.  Given the Parent's concession that her DPC did not contest the wheelchair accessibility of S.C.'s assigned school, the SRO decided that issue "was outside the scope of the impartial hearing and, therefore cannot be raised in this appeal." *Id.* at 19.  As the SRO concluded the DOE offered S.C. a FAPE for the 2021–2022 school year and that the school placement was appropriate, he did not address "whether the private education services obtained by the parent[] were appropriate for the student or whether equitable consideration support the parent's request for relief." *Id.* at 28.

## PROCEDURAL HISTORY

The Parent filed the instant suit against the DOE on November 23, 2022.  Dkt. No. 1.

She sought an order reversing the SRO's decision and declaring that the DOE failed to provide

S.C. with a FAPE for the 2021–2022 school year, that iBrain was an appropriate unilateral

placement for S.C., and that the equities favored the Parent.  *Id.* at 16.  She further requested an

order directing the DOE to fund any outstanding costs associated with S.C.'s iBrain enrollment,

related services, and transportation and to pay her attorney's fees and costs.  *Id.*  The DOE

answered the complaint on February 14, 2023.  Dkt. No. 9.

The Parent filed the certified administrative record on April 17, 2023.  Dkt. Nos. 14–14-

7.  She filed her motion for summary judgment the same day.  Dkt. No. 15.  The DOE filed a

cross-motion for summary judgment on May 8, 2023.  Dkt. No. 20.  The Parent and DOE

submitted opposition briefs on May 31 and June 13, 2023, respectively.  Dkt. Nos. 24, 27.

## LEGAL STANDARD

"Although the parties have styled their submissions as motions for summary judgment,

'the procedure is in substance an appeal from an administrative determination, not a summary

judgment.'"  *C.U. v. N.Y.C. Dep't of Educ.*, 23 F. Supp. 3d 210, 222 (S.D.N.Y. 2014) (quoting

*Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

Summary judgment in an IDEA case "involves more than looking into disputed issues of fact;

rather, it is a pragmatic procedural mechanism for reviewing administrative decisions."  *R.E. v.

N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012) (quoting *A.C. ex rel. M.C. v. Bd. of

Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)).  The district court must "engage in an independent

review of the administrative record and make a determination based on the preponderance of the

evidence."  *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837–38 (2d Cir. 2014)

(quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007)).  But this

independent review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982); *see also R.E.*, 694 F.3d at 189 (noting a federal court's review is "circumscribed"). Because "the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," the court "must give due weight to the administrative proceedings." *A.C.*, 553 F.3d at 171 (internal quotation marks and citations omitted). This review "requires a more critical appraisal of the agency determination than clear-error review, but nevertheless falls well short of complete de novo review." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (cleaned up) (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086–87 (1st Cir. 1993)).

"[C]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* at 241 (quoting *A.C.*, 553 F.3d at 171). "[W]here the SRO and IHO agree, deference to the conclusions of the administrators on this issue is particularly appropriate." *S.K. v. City Sch. Dist. of City of N.Y.*, 2020 WL 1244473, at *11 (S.D.N.Y. Mar. 13, 2020) (quoting *C.W. v. City Sch. Dist. of N.Y.*, 171 F. Supp. 3d 126, 131 (S.D.N.Y. 2016)). But the degree of deference depends on both the quality of the decisions and the nature of issue at hand. *See C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). "Deference is particularly appropriate when the state officer's review 'has been thorough and careful.'" *R.E.*, 694 F.3d at 184 (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)). "[C]ourts must look to the factors that 'normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence

and the witnesses than the reviewing court.'"  *Id.* at 189 (quoting *M.H.*, 685 F.3d at 244).

"Greater deference is also appropriate when reviewing the SRO's determination of the

substantive adequacy of an IEP and appropriate educational methodologies than on

determinations about the propriety of the procedures by which an IEP was developed."

*Thomason v. Porter*, 2023 WL 1966207, at *7 (S.D.N.Y. Feb. 13, 2023).  Finally, on legal

issues, "courts owe no deference to state hearing officers."  *Bd. of Educ. of Yorktown Cent. Sch.

Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021).

## DISCUSSION

The Parent seeks an order reimbursing the costs associated with S.C.'s enrollment at

iBrain during the 2021–2022 school year.  Dkt. No. 16 at 1.  The DOE argues that the Parent is

not entitled to a reimbursement order because the DOE offered S.C. a FAPE for that year.  Dkt.

No. 21 at 1.

States that receive funding under the IDEA must provide all disabled children with a

FAPE.  20 U.S.C. § 1412(a).  A FAPE "must include special education and related services

tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the

child to receive educational benefits."  *Frank G. v. Bd. of Educ.,* 459 F.3d 356, 363 (2d Cir.

2006) (internal quotation marks omitted).  The mechanism the IDEA established to guarantee a

FAPE to disabled children is the IEP.  *See* 20 U.S.C. § 1414(d)(1)(A); *T.Y. v. N.Y.C. Dep't of

Educ.*, 584 F.3d 412, 415 (2d Cir. 2009) ("[T]he centerpiece of the IDEA's education delivery

system is the individualized education program or 'IEP.'" (internal quotation marks and citation

omitted)).  As "a comprehensive statement of the educational needs of [the] handicapped child

and the specially designed instruction and related services to be employed to meet those needs,"

*C.F.*, 746 F.3d at 72 (quoting *Frank G.,* 459 F.3d at 363), the IEP must be "reasonably calculated

to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*

*ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130); *see also Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ginsburg, J.) ("[Federal law] does not secure the *best* education money can buy; it calls upon government, more modestly, to provide an *appropriate* education for each child.").

New York State "has assigned responsibility for developing appropriate IEPs to local Committees on Special Education, the members of which are appointed by school boards or the trustees of school districts." *Gagliardo*, 489 F.3d at 107 (internal quotation marks and citation omitted). The CSE is composed of several individuals, including the parent(s), the student's special education teacher, a school psychologist, a school district representative knowledgeable about the district's resources, a school physician, and a parent representative. N.Y. Educ. Law § 4402(1)(b)(1)(a); *see Y.A. v. N.Y.C. Dep't of Educ.*, 2016 WL 5811843, at *2 (S.D.N.Y. Sept. 21, 2016). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175. The State must consider the concerns of the student's parents when formulating the IEP and updating the IEP annually. *See C.S.*, 990 F.3d at 156. Finally, the school district "must also implement the IEP, which includes offering placement in a school that can fulfill the requirements set forth in the IEP." *S.K.*, 2020 WL 1244473, at *10 (quoting *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 509 (S.D.N.Y. 2013)); *see also K.R. ex rel. Matthew R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 301 (S.D.N.Y. 2015) ("A school district is not required to designate a specific

school in an IEP, but nevertheless may not assign a child to a school that cannot satisfy the IEP's requirements.").

If a parent believes that the IEP does not provide his or her child a FAPE, the parent may unilaterally enroll the child in a private school and seek reimbursement from the school district by filing a DPC.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009); *see also* 20 U.S.C. §§ 1412(a)(10)(C)(ii), 1415(b)(6), 1415(b)(7)(A); N.Y. Educ. Law § 4404(1).  The parent must then attend an impartial hearing before an IHO.  20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1).  Either party aggrieved by the IHO's findings or decision may appeal to an SRO.  20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2).  A party can then challenge the SRO's decision by bringing a civil action in federal or state court.  20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

Parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."  *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993) (quoting *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985)).  Under the Supreme Court's *Burlington*/*Carter* test, parents are entitled to reimbursement of private-school tuition only if: (1) the IEP and proposed placement fail to provide a FAPE; (2) the parent's private placement was appropriate to the child's needs; and (3) equitable considerations favor the parent's claim.  *See Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014); *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).  The DOE bears the initial burden of showing that it offered the student a FAPE at the first step, but "[i]f the [DOE] fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them."  *M.O. v. N.Y.C.*

*Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015).  By contrast, if the DOE meets its burden at

the first step, "the court need not consider the last two prongs of the *Burlington/Carter* test."

*Thomason*, 2023 WL 1966207, at *7 (citing *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226

F.3d 60, 66 (2d Cir. 2000)).

> To determine whether the DOE offered S.C. a FAPE for the 2021–2022 school year, the
Court first analyzes the Parent's substantive objections to the IEP,[2] and then addresses her
challenges to the designated DOE school's ability to implement S.C.'s IEP.

## I.      Substantive Adequacy of the IEP

> The Parent argues that S.C.'s IEP for the 2021–2022 school year failed to offer him a
FAPE because it lacked two indispensable features: music therapy sessions and extended school
days.  Dkt. No. 16 at 15–18.  The DOE retorts that neither was necessary to provide S.C. a
FAPE.  Dkt. No. 21 at 12–13, 15–17.

> According to the Parent, the administrative record demonstrates that music therapy is an
essential related service for S.C.  Dkt. No. 16 at 17.  She contends that the IHO and SRO erred in
overlooking "the iBRAIN director's testimony concerning the benefits of Music Therapy to
S.C.'s educational program."  *Id.*  Before the IHO, iBrain's director of special education
described how S.C. benefitted from music therapy sessions.  *See* A.R. 236 ("[T]he music
therapy, essentially, bypasses some of the other processing centers in the brain which have
sustained damage, and is able to help facilitate responses that are not using those same
neuropathways.  And so it can help to support the development of a range of different skills.").

---

[2] Although "IEPs are subject to numerous procedural and substantive requirements," *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003), the Parent does "not assert procedural violations of the IDEA . . . but rather challenge[s] the substantive adequacy" of S.C.'s IEP, *H.C. ex rel. M.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, 528 F. App'x 64, 66 (2d Cir. 2013); *see* Dkt. No. 16 at 8.

Her testimony echoed the iBrain education plan for S.C., which recommended music therapy sessions to pursue sensorimotor, cognitive, and communicative goals. *Id.* at 560 (stating S.C.'s goals from music therapy were to participate in improvisational music by extending his upper extremities, localize sounds on his left and right sides, and activate a switch to request more music).

But the IHO also heard the testimony of a DOE school psychologist who served on the CSE that drafted S.C.'s IEP. She explained the rationale for omitting music therapy:

> [W]e felt that the [music therapy] goals would be able to be met through the other service[s] and through the program we were creating with the management needs. . . . [I]n general, what the music therapy goals set out to do was to have him actively participate and to have him increase his communication and increase his interpersonal skills. And those—those goals are—are met in other ways through management needs, through the OT/PT and speech and language services as well as with the assistive technology services to increase the communication.

A.R. 170–71. S.C.'s IEP included goals that closely paralleled the music therapy objectives in iBrain's education plan, namely: "demonstrat[ing] improved shoulder and elbow range of motion by reaching forward 1 inch with arms supported," *id.* at 448; *see also id.* at 452–53, "turn[ing] his head towards [an auditory] stimulus in order to locate where it is coming from," *id.* at 458, and "activating a switch to make single-step requests during leisure activities (i.e., 'next page please,' 'more music') with minimal physical assistance," *id.* at 448–49.

Contrary to the Parent's assertion that the IHO and SRO did not "properly consider[] the iBRAIN director's testimony" regarding music therapy, Dkt. No. 16 at 17, both the IHO and SRO acknowledged the iBrain director's explanation of music therapy's benefits for S.C, A.R. 20, 37. Yet the IHO and SRO ultimately credited the DOE psychologist's testimony that those same benefits could be achieved through other therapeutic interventions. *Id.* at 21, 38. The SRO's analysis of music therapy was particularly well reasoned, parsing its benefits and alternatives over ten painstaking paragraphs. *Id.* at 19–22.

Based on the administrative record and decisions, the Court concludes that the omission of music therapy did not render S.C.'s IEP substantively inadequate.  The IHO and SRO's view that music therapy was unnecessary to offer S.C. a FAPE is entitled to considerable deference. The IHO and SRO's unanimity makes deference "particularly apt" here.  *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014); *see also Mason v. Carranza*, 2023 WL 6201407, at *2 (E.D.N.Y. Sept. 22, 2023).  And the SRO's thorough examination of how other related services in the IEP could serve the physical, social, and communicative objectives of music therapy "was sufficiently reasoned and adequately supported by the administrative record."  *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 146 (2d Cir. 2019).  Whether services other than music therapy could effectively promote those objectives is a question of "[t]he sufficiency of goals and strategies in an IEP," and thus "precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 118 (2d Cir. 2016) (quoting *Grim*, 346 F.3d at 382).  Courts in this District have therefore rejected similar arguments that music therapy is indispensable to a FAPE.  *See G.S. v. N.Y.C. Dep't of Educ.*, 2016 WL 5107039, at *12 (S.D.N.Y. Sept. 19, 2016) ("[T]he lack of music therapy in the IEP did not deny K.S. a FAPE."); *N.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 592 (S.D.N.Y. 2013) ("Although the record demonstrates that music therapy was beneficial for J.K., it does not support the conclusion that J.K. could not have a FAPE without it.").  In short, the "IDEA does not require a school district to furnish 'every special service necessary to maximize each handicapped child's potential.'"  *D.B. v. Ithaca City Sch. Dist.*, 690 F. App'x 778, 783 (2d Cir. 2017) (quoting *Rowley*, 458 U.S. at 199).  While the record indicates that S.C. "may have *benefited* from [music therapy], it contains no indication that such services were *necessary*."  *R.B. v. N.Y.C. Dep't of Educ.*, 2013 WL 5438605, at *15

(S.D.N.Y. Sept. 27, 2013) (Nathan, J.), *aff'd*, 589 F. App'x 572 (2d Cir. 2014). Because the law demands "an *appropriate* education, not one that provides 'everything that might be thought desirable by loving parents,'" *J.R. v. N.Y.C. Dep't of Educ.*, 748 F. App'x 382, 386 (2d Cir. 2018) (quoting *Walczak*, 142 F.3d at 132), the IEP's omission of music therapy did not deprive S.C. of a FAPE.

Next, the Parent contends that the IEP is substantively inadequate due to its failure to mandate an extended school day. Dkt. No. 16 at 15. She argues that the related services the IEP recommended for S.C. "would be impossible to implement alongside academic instruction without an extended school day." *Id.* at 20. Under the IEP, S.C. would attend thirty-five periods of 6:1:1 special education classes per week. A.R. 463. However, the IEP also stipulated that S.C. receive nineteen hours of related services for S.C. per week. *Id.* at 463–64. The Parent avers that it is "*mathematically impossible* to provide S.C. with all required academic instruction and related services in a regular school day." Dkt. No. 16 at 21. But the Parent's impossibility argument overlooks the fundamental distinction between "pull-out" and "push-in" services: "In a 'pull-out' model, a specialist provides instructional support or related services, to one student or a small group, in a separate setting outside of the general education classroom. Conversely, in a 'push-in' model, a specialist provides those services in the classroom." *J.D. v. Rye Neck Union Free Sch. Dist.*, 2023 WL 1797170, at *3 n.3 (S.D.N.Y. Feb. 7, 2023). Push-in services thus occur simultaneously with classroom instruction. Here, the IEP stated that "the majority of the related service sessions should be push-in so that [S.C.] can work towards his academic goals. However, when new skills are introduced or if a session mandates a separate location, pull-out services are recommended." A.R. 433. As S.C. could receive related services during his regular classes, the DOE could provide both without an extended school day. *See id.* at 17 ("[T]he

hearing record does not support the parent's view that it was mathematically impossible for the student to receive the recommended related services without extended school day services.").

Even if the Court were to construe the Parent's argument as a challenge to the efficacy of push-in services, *cf.* A.R. 408 (contending that providing S.C.'s related services on a push-in basis would deprive him of "the opportunity to learn and practice new skills free of distraction"), her objection to the IEP would remain unavailing. iBrain's director of special education testified that the school "incur[s] about a 50-50 split of push-in and pull-out services." A.R. 254. She also extoled the benefits of push-in services for S.C., opining that they "serve to facilitate and enhance instruction, but not as a competition to instruction." *Id.* at 256. The CSE similarly concluded that push-in therapies would help S.C. receive necessary services while benefitting from classroom instruction. *Id.* at 433. Thus, the Parent's bare assertion that the DOE must deliver S.C.'s related services on a pull-out basis to provide a FAPE lacks an adequate foundation in the record. Absent evidence that pull-out services were necessary for S.C., the Court will not presume to resolve an education policy debate "over whether 'pull-out' . . . services are preferable to 'push-in' services." *Marple Newtown Sch. Dist. v. Rafael N.*, 2007 WL 2458076, at *6 (E.D. Pa. Aug. 23, 2007); *see also Davis v. District of Columbia*, 244 F. Supp. 3d 27, 34 (D.D.C. 2017) (upholding a student's IEP under which "instead of being pulled *out* of the classroom for [related services] interventions, the [DOE] kept her *in* the classroom for push-in services"). Arrogating that authority from education experts and policymakers would flout the judicial modesty that has long defined IDEA jurisprudence. *See Rowley*, 458 U.S. at 208 ("We previously have cautioned that courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." (internal quotation marks

omitted)).  The Court therefore deems the IEP substantively adequate, even though it did not require an extended school day.

## II.    Implementation of the IEP

The Parent also avers that the DOE deprived S.C. of a FAPE by assigning him to a school that could not implement his IEP.  Dkt. No. 16 at 8.  She contends that the designated school is inadequate as it does not offer extended school days, primarily serves autistic students, and is not wheelchair accessible.  *Id.*  The DOE counters that the IHO and SRO correctly determined that S.C.'s assigned District 75 school could implement his IEP.  Dkt. No. 21 at 12.  Moreover, the DOE emphasizes that S.C. never attended the assigned school, so the Parent's concerns are impermissibly speculative.  *Id.*

The Parent's first argument—that S.C.'s assigned school could not implement an adequate IEP because it did not offer an extended school day, Dkt. No. 16 at 15—is entirely derivative of her substantive objection that the IEP should have mandated an extended school day.  *See N.B. v. N.Y.C. Dep't of Educ.*, 2016 WL 5816925, at *5 (S.D.N.Y. Sept. 29, 2016) ("[T]hese arguments collapse back into [the parents'] challenge to the IEP itself."), *aff'd*, 711 F. App'x 29 (2d Cir. 2017).  As explained above, the IEP offered S.C. a FAPE even though it did not require an extended school day.  Consequently, S.C.'s assigned school could implement his IEP without extending school hours.  Because the Parent's objection presumes that S.C. requires an extended school day, the SRO aptly described her objection as "'a substantive attack on the IEP couched as a challenge to the adequacy' of the assigned public school site's capacity to implement the IEP."  A.R. 24 (cleaned up) (quoting *M.O.*, 793 F.3d at 245).  Yet "[t]he Court has already concluded that [the] IEP was substantively adequate," *A.L. ex rel. C.L. v. N.Y.C. Dep't of Educ.*, 2017 WL 11697978, at *12 (S.D.N.Y. July 11, 2017) (Nathan, J.), so the DOE did not err in assigning S.C. to a school that operated only during ordinary school hours.

Next, the Parent argues that the DOE's designated school was "entirely inappropriate" for S.C. because "he would have been grouped with students with autism." Dkt. No. 16 at 15. To support that conclusion, the Parent relies on the testimony of iBrain's director of special education before the IHO that "6:1:1 classes in [District 75 schools] . . . are very consistently for students who are on the autism spectrum." A.R. 233. She also opined that "students that are on the autism spectrum . . . would be a really inappropriate peer group" for S.C. for two reasons: First, "it would be physically unsafe for [S.C.] to be in a room with these students, because they lack safety awareness, and they lack an awareness of their peers . . . [and] are often impulsive." *Id.* at 234; *see also id.* at 235 ("[S]ome students with autism do present with behavioral challenges, which against would pose a huge threat to [S.C.]"). Second, she stated that autistic students would contribute to a poor "learning environment" in a 6:1:1 class, as "they often require devices to communicate, or very often, display echolalia, where they will repeat a lot of phrases, really without communicative intent. . . . [T]o have phrases repeated often without meaning and purpose would just present a lot of confusion for [S.C.] that I think would be extremely detrimental to his academic learning." *Id.* at 235–36. However, the iBrain director acknowledged that her conclusion was based on her experience teaching at a single District 75 school in Brooklyn during the 2010–2011 school year and that she was unfamiliar with the specific school to which S.C. had been assigned. *Id.* at 250.

Any concerns regarding the students with whom S.C. would be grouped at his assigned DOE school were impermissibly speculative. Because the IEP "is not facially inadequate," the Parent "bear[s] the burden of proof" in challenging "the adequacy of a proposed placement." *Z.C. v. N.Y.C. Dep't of Educ.*, 222 F. Supp. 3d 326, 338 (S.D.N.Y. 2016) (quotation marks omitted). Such challenges must be "evaluated as of the time the parent made the placement

decision (i.e., 'prospectively').'" *Id.* at 337 (quoting *M.O.*, 793 F.3d at 244). "Only where parents offer 'non-speculative objections to a proposed school' does 'the school district . . . ha[ve] the burden to produce evidence demonstrating the placement's adequacy in response to these arguments.'" *E.E. v. N.Y.C. Dep't of Educ.*, 2018 WL 4636984, at *11 (S.D.N.Y. Sept. 26, 2018) (alterations in original) (quoting *N.M. v. N.Y.C. Dep't of Educ.*, 2016 WL 796857, at *1 (S.D.N.Y. Feb. 24, 2016)). "While it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *M.O.*, 793 F.3d at 244 (citation omitted). And "when—as here— the IEP at issue is itself adequate, 'there will be few circumstances in which a parent can successfully challenge a placement if their child never attended the [recommended] school.'" *L.B. v. N.Y.C. Dep't of Educ.*, 2016 WL 5404654, at *22 (S.D.N.Y. Sept. 27, 2016) (Nathan, J.) (quoting *J.M. v. N.Y.C. Dep't of Educ.*, 171 F. Supp. 3d 236, 249 (S.D.N.Y. 2016)).

The Parent's concern falls short of that high bar. "New York regulations require that a student be placed in a class 'based on the similarity of the individual needs of the students according to' academic achievement, social development, physical development, and management needs." *Thomason*, 2023 WL 1966207, at *16 (quoting 8 N.Y.C.R.R. § 200.6(h)(2)). "[U]niformity of needs . . . is not required." *E.P. v. N.Y.C. Dep't of Educ.*, 2016 WL 3443647, at *6 (S.D.N.Y. June 10, 2016) (quoting *E.A.M. v. N.Y.C. Dep't of Educ.*, 2012 WL 4571794, at *10 (S.D.N.Y. Sept. 29, 2012)); *see also B.M. v. Pleasantville Union Free Sch. Dist.*, 2021 WL 4392281, at *21 n.14 (S.D.N.Y. Sept. 24, 2021). But courts have consistently denied grouping challenges when parents decide not to enroll their children in DOE-assigned schools for the simple reason that the parents cannot know the students with whom their children

will be placed when they reject the DOE placement.  *See J.C. v. N.Y.C. Dep't of Educ.*, 643 F. App'x 31, 33 (2d Cir. 2016) (summary order) ("[G]rouping evidence is not the kind of non-speculative retrospective evidence that is permissible under *M.O.*"); *Thomason*, 2023 WL 1966207, at *16; *B.M.*, 2021 WL 4392281, at *21; *E.E.*, 2018 WL 4636984, at *12 ("[T]he Parent's argument is speculative because there was no guarantee as to the composition of the class in which the Student would have been placed had he attended the proposed placement."); *N.M.*, 2016 WL 796857, at *8; *see also M.T. v. N.Y.C. Dep't of Educ.*, 2016 WL 1267794, at *13 (S.D.N.Y. Mar. 29, 2016) ("[C]omposition of the class may change depending on fluctuations in enrollment, and on other parents of students with IEPs who are making their own placement decisions.").  So too here: the Parent did not know the students with whom S.C. would be grouped at the assigned District 75 school when she decided to unilaterally re-enroll him at iBrain.  Thus, her fear that he would be inappropriately grouped with ambulatory, autistic students was founded in conjecture, not fact.

The iBrain director's testimony underscores the speculative nature of the Parent's grouping objection.  While the iBrain director asserted that 6:1:1 classes at District 75 schools are "very consistently for students who are on the autism spectrum," A.R. 233, she also admitted that she had reached that conclusion by extrapolating from her experience teaching at a single District 75 school more than a decade ago, *id.* at 250.  Neither the Parent nor the iBrain director has offered any reason to believe her experience at that school was representative of the current 25,000-student District 75 system as a whole,[3] let alone the specific school to which S.C. had been assigned and with which the iBrain director stated she was unfamiliar.  *Id.*  As long as the

---

[3] *See NYC Spec Schools – Dist 75 Enrollment (2021 – 2022)*, N.Y. State Educ. Dep't (last accessed Nov. 21, 2023), https://data.nysed.gov/enrollment.php?year=2022&instid= 800000057444.

assigned school enrolled five students whose needs were sufficiently similar to S.C.'s to permit a functional grouping, then the school had the "capacity to implement [his] IEP" by placing S.C. in an appropriate 6:1:1 classroom environment.  *M.O.*, 793 F.3d at 244.  The iBrain director's generalizations—untethered to any observation or knowledge of S.C.'s assigned school—cannot rule out that possibility.  As a result, her anecdotal "observations and subjective conclusions . . . are not sufficient to overcome the presumption that the proposed placement was capable of implementing the IEP."[4]  *E.B. v. N.Y.C. Dep't of Educ.*, 2016 WL 3826284, at *8–9 (S.D.N.Y. July 12, 2016); *see also S.K.*, 2020 WL 1244473, at *12; *E.P.*, 2016 WL 3443647, at *9; *J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 606 (S.D.N.Y. 2015).

Finally, the Parent argues that S.C.'s assigned school could not implement his IEP because the school building is not wheelchair accessible.  Dkt. No. 16 at 15.  In response, the DOE contends that this issue is foreclosed from judicial review, as the Parent failed to object the wheelchair accessibility of S.C.'s assigned school in her DPC.  Dkt. No. 21 at 13.

By statute, a parent "requesting [a] due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [DPC], unless the other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).  Likewise, "issues not raised in due process complaints

---

[4] Without a firmer evidentiary foundation, the Parent and iBrain director's grouping concerns risk "stereotyp[ing] students with different disability classifications" than S.C.  A.R. 27; *see also S.K.*, 2020 WL 1244473, at *5 (citing an IHO's "finding that Plaintiff's stereotypical description of autistic children is not based on facts placed into this record" (quotation marks omitted)).  Assuming that any autistic students with whom S.C. would be grouped would necessarily exhibit the behaviors described by the iBrain director is contrary to the diversity of symptoms and experiences of children with autism spectrum disorder.  *See Autism Spectrum Disorder*, Nat'l Inst. Mental Health (2022) ("Autism is known as a 'spectrum' disorder because there is wide variation in the type and severity of symptoms people experience."), https://www.nimh.nih.gov/ sites/default/files/documents/health/publications/autism-spectrum-disorder/22-MH-8084-Autism-Spectrum-Disorder.pdf.  And the Court is particularly loath to credit the blanket assertion that autistic students are uniformly violent or dangerous.

are [generally] foreclosed from review in federal court, absent agreement from the opposing

party." *C.F.*, 746 F.3d at 78. But the Second Circuit has admonished that this "waiver rule is not

to be mechanically applied." *Id.* In *C.F.*, the Second Circuit held that an objection was properly

raised before the district court when the DPC "provided fair notice to the [DOE] of their claim."

*Id.* The Circuit further concluded another objection was preserved when "both the IHO and SRO

reached the issue on the merits" and the objection related to an issue "at the heart of this

dispute." *Id.*

District Courts have interpreted *C.F.* as establishing three alternative means of preserving

a challenge for judicial review: "(1) the [d]ue [p]rocess [c]omplaint provides fair notice to the

[school district] of the argument at issue; (2) both the IHO and SRO reach the issue on the

merits, giving the federal court a record for review; or (3) the argument goes to the heart of [the]

dispute." *Davis v. Carranza*, 2021 WL 964820, at *6 (S.D.N.Y. Mar. 15, 2021) (alterations in

original) (quoting *S.B. v. N.Y.C. Dep't of Educ.*, 117 F. Supp. 3d 355, 362 (S.D.N.Y. 2015)); *see

also C.W.*, 171 F. Supp. 3d at 135. However, that disjunctive test stands in tension with *B.P. v.

New York City Department of Education*, 634 F. App'x 849 (2d Cir. 2015) (summary order).

Addressing the argument that *C.F.* "allows federal courts to hear claims not raised in a due

process complaint if either the SRO or IHO made a record regarding the issue or if the issue goes

to the heart of the dispute," *id.* at 849, the *B.P.* panel explained:

> We are not persuaded. First, *C.F.* indicates that if a matter goes to the heart of the
> dispute *and* is discussed by both the IHO *and* the SRO, the matter will not
> necessarily be foreclosed by the failure to raise it in a due process complaint.
> Second, and more importantly, in *C.F.* the issue deemed waived was not completely
> absent from the due process complaint.

*Id.* at 849–50.

But the Court need not decide whether *C.F.* supports the three-part, disjunctive test for

issue preservation, because even if that "plaintiff-friendly" framework applies, *F.B. v. N.Y.C.*

*Dep't of Educ.*, 132 F. Supp. 3d 522, 547 (S.D.N.Y. 2015) (quoting *C.U.,* 23 F. Supp. 3d at 224), the Parent cannot satisfy it.  First, the DPC did not provide fair notice to the DOE that the Parent objected to S.C.'s assigned school due to its wheelchair inaccessibility.  To the contrary, the Parent's briefing before the SRO conceded that "the school's inaccessibility was not raised in the DPC."  A.R. 61; *see also id.* at 83 ("[T]he school's inaccessibility was not explicitly raised in the DPC.").  Nor was the accessibility challenge "encompass[ed]" within the DPC's affirmative arguments.  *C.F.*, 746 F.3d at 78.  While a broader objection in a DPC can preserve a narrower, entailed challenge, courts have required the broader objection to be "sufficiently specific" to ensure the due process procedure remains a meaningful opportunity for the DOE to correct errors, rather than an idle prelude to litigation.  *Thomason*, 2023 WL 1966207, at *15; *see also B.P.*, 634 F. App'x at 850; *Davis*, 2021 WL 964820, at *6.  Here, the Parent avers that her wheelchair-accessibility challenge was encompassed within the DPC's assertion that the "DOE failed to recommend an appropriate school location."  Dkt. No. 16 at 9 (quoting A.R. 407).  But that sentence was the heading for two paragraphs that challenged placement with autistic students and the lack of an extended school day, respectively.  A.R. 407–08.  As a result, one reading the header in context would not receive "fair notice" that the Parent would subsequently oppose the assigned school's physical infrastructure.  *C.F.*, 746 F.3d at 78.

The Parent urges the Court to divorce the header from its ensuing paragraphs and treat it as a standalone challenge to any and all aspects of S.C.'s assigned school.  But just as "the mere assertion in the DPC that a child was denied a FAPE" is insufficient "to preserve every potential substantive argument," *Thomason*, 2023 WL 1966207, at *15, the Parent's blanket objection that the DOE did not recommend "an appropriate school location" is inadequate to preserve every conceivable implementation challenge.  Otherwise, parents could incant a single sentence

opposing the IEP and school placement in a DPC and then "sandbag the school district" at will. *R.E.*, 694 F.3d at 188.  Such a rule would undermine the efficiency and corrective purpose of due process procedures, yielding more protracted and expensive disputes between parents and the DOE.

Second, neither the IHO nor SRO reached the Parent's accessibility objection.  When an issue that was not raised in a DPC is fully adjudicated in administrative proceedings, federal courts still have "a record for [judicial] review."  *C.F.*, 746 F.3d at 78.  Here, by contrast, after asking and then withdrawing a single question as to whether a school that is not accessible would be appropriate for S.C., A.R. 181–82, the Parent asserted for the first time in her closing argument before the IHO that the "DOE seems to have taken so little effort in finding a school location for [S.C.] that they failed to even recommend a location that was wheelchair accessible," *id.* at 216.  The IHO declined to reach that objection, ruling that the Parent had failed to preserve it.  *Id.* at 39 ("The due process complaint enumerates several issues that contest with respect to the placement.  They do not mention anything about wheelchair accessible and only bring it up as part of their closing.").  Before the SRO, the Parent argued that the IHO had erred by "improperly exclud[ing] evidence confirming the inaccessibility of [the assigned school,] and improperly fail[ing] to consider argument concerning the impossibility of [that school] to implement the IEP . . . because S.C. could not get to his classroom."  *Id.* at 57.  Yet the SRO adopted the IHO's conclusion that "this accessibility issue was not among the issues in the due process complaint notice and was outside the scope of the impartial hearing and, therefore, cannot be raised in this appeal."[5]  *Id.* at 18–19.  As the record on accessibility is limited to the

---

[5] The SRO also determined that the DOE had not opened the door to the Parent's accessibility objection through its witness's testimony.  A.R. 18.  Notably, the Parent does not challenge that conclusion before this Court and even concedes that the DOE's witness "did not address the

procedural question of whether the Parent preserved her challenge, this Court would be the first
to reach the merits of that objection.  Both prudence and law forbid exploring that *terra
incognita* without the benefit of a reasoned administrative decision based on evidence and
argument from both parties.

Finally, the wheelchair accessibility of S.C.'s assigned school is not "at the heart of this
dispute."  *C.F.*, 746 F.3d at 78.  The Parent advances a capacious interpretation of this exception,
suggesting that any challenge to S.C.'s assigned school goes to the heart of the case.  *See* Dkt.
No. 24 at 9 ("[T]he proposed placement is 'relevant' to this matter—the proposed placement *is*
the matter.").  But defining the heart of the dispute at such a high level of generality would allow
the exception to swallow the rule.  Instead, that exception must be construed in accordance with
the pragmatic rationales for deviating from a strict adherence to the requirement that parents
articulate their objections in a DPC.  When an issue is encompassed within a DPC or actually
addressed by the IHO or SRO, a court can reach it without blindsiding either party or straying
from the administrative record.  Likewise, if an issue is sufficiently similar to or intertwined with
the arguments actually raised and litigated so as to go to the heart of the dispute, addressing that
issue does not deprive the parties of fair notice or require the Court to write on a blank slate.
Regardless of whether that issue was technically encompassed in the DPC or directly addressed
by the IHO or SRO, such an issue is still fit for judicial resolution.  For example, if a DPC avers
that a particular environment or service is necessary to address one of the student's needs, then
the argument that a related environment or service would similarly fulfill that need would go to
the heart of the dispute.  *See K.R. ex rel. Matthew R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d

---

assigned school site or the parent's claim of a lack of accessibility for the student."  Dkt. No. 16
at 10 (quoting A.R. 15).

295, 310 (S.D.N.Y. 2015) (holding the argument that a student required sensory equipment went to the heart of a dispute when the parents' hearing request argued the school "classroom environment is too loud, chaotic, and stressful" for their child).  But the Parent's accessibility argument here is "independent" of the classroom composition and extended hours objections raised in her DPC and adjudicated by the IHO and SRO.  *C.U.*, 23 F. Supp. 3d at 224.  Rather, those objections concerned unrelated measures to satisfy distinct physical and cognitive needs. Because S.C.'s use of a wheelchair lies beyond the heart of this dispute, the Court cannot reach the Parent's belated accessibility challenge.

In sum, the Parent has not properly raised a non-speculative challenge to S.C.'s assigned school.  The Court therefore concludes that his school assignment for the 2021–2022 school year did not deprive him of a FAPE.  Because the DOE offered S.C. a FAPE during that school year, the Parent is not entitled to reimbursement for her unilateral placement of S.C. at iBrain, and the Court need not address the remaining prongs of the *Burlington/Carter* test.  *See M.C.*, 226 F.3d at 66.

## III.   The Pendency Order

In addition to her objections to S.C.'s IEP and school placement, the Parent argues that the DOE has not fully complied with the IHO's stay-put order.  Dkt. No. 16 at 22.  Because that order remained in place throughout the entirety of the 2021–2022 school year, she observes that "[o]n the basis of pendency, S.C.'s education should have been funded in full."  *Id.* at 23.  Yet she alleges that the DOE has failed to reimburse the costs of S.C.'s 1:1 nursing services.  *Id.*; *see also* Dkt. No. 24 at 18.  The DOE responds with a conclusory assertion that it complied with the IHO's stay-put order.  Dkt. No. 21 at 1 ("[T]he DOE already funded the Student's unilateral placement at iBrain for the 2021–2022 school year during pendency and this argument is moot.").

Under the IDEA's stay-put provision, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j).  That provision "require[s] that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014) (quoting *Mackey ex rel. Thomas M. v. Bd. of Educ.*, 386 F.3d 158, 163 (2d Cir. 2004)).  Although "an initial placement is made by the school district upon the consent of the parent," *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 532 (2d Cir. 2020), "[o]nce a pendency placement has been established, . . . it can only be changed in one of four ways: (1) by an agreement of the parties; (2) by an unappealed administrative decision; (3) by a decision of a state review officer that agrees with the child's parents that a change in placement is appropriate; or (4) by determination by a court on appeal from an SRO's decision." *S.S. v. N.Y.C. Dep't of Educ.*, 2021 WL 3188323, at *1 (S.D.N.Y. July 28, 2021) (quoting *Student X v. N.Y.C. Dep't of Educ.*, 2008 WL 4890440, at *20 (E.D.N.Y. Oct. 30, 2008)).

As a practical matter, the DOE's duty to finance a child's then-current placement often covers the entirety of disputed a school year.  "A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed." *Burlington*, 471 U.S. at 370.  Consequently, "the pendency scheme almost invariably leads to school districts' advancing the cost of private school tuition for an entire school year, and sometimes beyond, based on pendency alone." *N.Y.C. Dep't of Educ. v. S.S.*, 2010 WL 983719, at *6 (S.D.N.Y. Mar. 17, 2010).  Nevertheless, the "the Department's responsibility for pendency tuition paid during a due process challenge is absolute, and not subject to recovery."

*Id.* at *8; *see Ventura de Paulino*, 959 F.3d at 531 ("Congress's policy choice was that a child is entitled to remain in his or her placement at public expense during the pendency of an IEP dispute, regardless of the merit of the child's IEP challenge or the outcome of the relevant proceedings."). Thus, "even where, as is the case here, the district met its obligation to offer the child a FAPE in a public school setting," *S.S.*, 2010 WL 983719, at *6, a reimbursement claim under a stay-put provision must be "evaluated independently" from challenges to the substance or implementation of an IEP, *Mackey*, 386 F.3d at 162.

Based on the administrative record, the Court is unable to determine whether the DOE's pendency obligations required it to fund S.C.'s 1:1 nursing services. Because the "IDEA does not speak directly to what [nursing] costs, if any, the DOE is obligated to pay, . . . the sole source of the DOE's reimbursement obligations in each Plaintiff's case is the applicable administrative order." *Davis v. Banks*, 2023 WL 5917659, at *5 (S.D.N.Y. Sept. 11, 2023). However, the text of the administrative order here is equivocal. The IHO's pendency order acknowledged that there was "no dispute" that an IHO's unappealed decision in a prior IDEA challenge the Parent brought against the DOE established that iBrain was S.C.'s then-current placement. A.R. 114. The pendency order then provides that "[t]he DOE shall directly fund the cost of Student's attendance at The International Institute of the Brain with the cost of the related services during the 2021-2022 extended school year which includes related services, and a 1:1 paraprofessional." *Id.* But the pendency order does not enumerate the related services that the DOE must fund. While the order's explicit reference to the costs of S.C.'s 1:1 paraprofessional provides some support for the view that the order implicitly excluded his 1:1 nursing care, the administrative record demonstrates that the IHO's wording did not reflect a settled view. When the parties alerted the IHO to their disagreement over whether the controlling decision entitled S.C. to

nursing services, the IHO avoided the issue by writing a pendency order that simply tracked the language of the prior decision.  *See id.* at 135 ("I plan to track the decision the way it's written and not make my own interpretation whether it includes the nurse or not.").  Accordingly, neither "[t]he language of the applicable order[]" nor the transcripts of the pendency proceeding "afford a clear answer" as to whether 1:1 nursing care is a related service under the pendency order. *Davis*, 2023 WL 5917659, at *5.

The Court therefore denies both parties' motions for summary judgment and remands this case for clarification on the limited question of whether the IHO's pendency order requires the DOE to pay for S.C.'s 1:1 nursing services during the 2021–2022 school year.  "A court may remand a proceeding when it needs further clarification or does not have sufficient guidance from the administrative agencies."  *Hidalgo v. N.Y.C. Dep't of Educ.*, 2021 WL 2827037, at *5 (S.D.N.Y. July 7, 2021) (quoting *T.L. v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 417, 436 (E.D.N.Y. 2013)).  Remand is especially appropriate when the administrative record is insufficient for a court to interpret a pendency order, because "[t]he IHOs are plainly in the best position to interpret their own orders and, to the extent the existing orders do not resolve the parties' dispute, further factfinding may be warranted."  *Donohue v. Banks*, 2023 WL 6386014, at *12 (S.D.N.Y. Sept. 30, 2023) (alteration in original) (quoting *Davis*, 2023 WL 5917659, at *5).  Accordingly, the Court will "return[] the case to the administrative agency for all further adjudication and [will] not retain jurisdiction."  *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 113 n.5 (2d Cir. 2008).

## CONCLUSION

The Parent's motion for summary judgment, Dkt. No. 15, is DENIED.  The DOE's motion for summary judgment, Dkt. No. 20, is DENIED as to the DOE's financial obligations

for S.C.'s 1:1 nursing services under the pendency order but GRANTED in all other respects. This case is REMANDED for further proceedings consistent with this Opinion and Order.

The DOE shall confer with the Parent and, no later than December 7, 2023, file a proposed judgment consistent with the Court's decision.

The Clerk of Court is respectfully directed to close Dkt. Nos. 15 and 20 and close this case.


SO ORDERED.

Dated: November 27, 2023
     New York, New York
                                       LEWIS J. LIMAN
                               United States District Judge